# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAWN MARIE DIXON-BEY,

        Defendant-Appellant.

FOR PUBLICATION
September 26, 2017

No. 331499
Jackson Circuit Court
LC No. 15-004596-FC

---

Before: O'BRIEN, P.J., and HOEKSTRA and BOONSTRA, JJ.

Boonstra, J. (*concurring in part and dissenting in part*).

I concur with the majority in affirming defendant's conviction. I respectfully dissent, however, from the majority's holding that the trial court's sentencing departure violated the principle of proportionality.

As the majority acknowledges, we review a trial court's sentencing departure for "reasonableness," *Lockridge*, 498 Mich at 391-392, and we review for an abuse of discretion the reasonableness of the sentence imposed by the trial court, *People v Steanhouse*, ___ Mich ___, ___; ___ NW2d ___ (2017) (Docket Nos. 152671, 152849, 152871-152873, 152946-152948), slip op at 10. In reviewing a sentence for reasonableness, we must apply the "principle-of-proportionality test" that was adopted in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990). *Steanhouse,* ___ Mich at ___, slip op at 10.

Our Supreme Court recently emphasized in *Steanhouse* that " 'the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range.' " *Id.* at ___, slip op at 10, quoting *Milbourn*, 435 Mich at 661. And the Court specifically disavowed "dicta in our proportionality cases [that] could be read to have urg[ed] that the guidelines should almost always control" and that thus could be interpreted as "creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Id.* at ___, slip op at 11 (quotation marks and citations omitted). The *Steanhouse* Court also specifically disavowed the statement in *Milbourn* that departure sentences should "alert the appellate court to the possibility of a misclassification of the seriousness of a given crime by a given offender and a misuse of the legislative sentencing scheme." *Id.* at ___, slip op at 11, quoting *Milbourn*, 435 Mich at 659. "Rather than impermissibly measuring proportionality by reference to deviations from the guidelines, our principle of proportionality requires 'sentences imposed by the trial court to be proportionate to the seriousness of the

circumstances surrounding the offense and the offender.' " *Id.* at __, slip op at 11, quoting *Milbourn*, 435 Mich at 636. See also *People v Walden*, ___ Mich App ___, ___; ___ NW2d ___ (2017) (Docket No. 330144); slip op at 4-5.

Again, the trial court's application of the "principle-of-proportionality test" is reviewed by this Court for an abuse of discretion. *Steanhouse*, ___ Mich at __, slip op at 10. An abuse of discretion occurs when the trial court's decision falls outside a "range of principled outcomes." *People v Smith*, 482 Mich 292, 300; 754 NW2d 284 (2008); *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). The abuse of discretion standard acknowledges that "[b]ecause of the trial court's familiarity with the facts and its experience in sentencing, the trial court is better situated than the appellate court to determine whether a departure is warranted in a particular case." *People v Babcock*, 469 Mich 247, 268; 666 NW2d 231 (2003). Moreover, "[a]t its core, an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." *Id.* at 269. "When the trial court selects one of these principled outcomes, the trial court has not abused its discretion and, thus, it is proper for the reviewing court to defer to the trial court's judgment." *Id.*

I am unable to conclude on the record before us that the trial court selected an unprincipled outcome in this case.

In rendering a sentence, a trial court in Michigan is no longer obliged to articulate a "substantial and compelling reason" to depart from the sentencing guidelines range. *People v Lockridge*, 498 Mich at 391-392 (striking down that requirement of MCL 769.34(3)). But it must still "justify the sentence imposed in order to facilitate appellate review." *Id.* at 392. See also *Steanhouse*, __ Mich at __, slip op at 10. Indeed, that requirement "reflects sound judicial practice. Judicial decisions are reasoned decisions. Confidence in a judge's use of reason underlies the public's trust in the judicial institution. A public statement of those reasons helps provide the public with the assurance that creates that trust." *Rita v United States*, 551 US 338, 356; 127 S Ct 2456; 168 L Ed 2d 203 (2007).

However, when a trial court justifies an imposed sentence, "[t]he appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances," and "[t]he law leaves much, in this respect, to the judge's own professional judgment." *Id.* "The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Id.* Depending on the circumstances, that statement of reasons may be "brief but legally sufficient." Id. at 358. "By articulating reasons, even if brief, the sentencing judge . . . assures reviewing courts (and the public) that the sentencing process is a reasoned process . . . ." *Id.* at 357.

The sentencing judge in this case arguably could have said more. And saying more rather than less certainly aids an appellate court in assessing the reasonableness of a sentence. Ultimately, however, the relevant inquiry is whether the trial court followed a "reasoned" process that led to a "reasoned" decision. *Id.* at 356-359.

At the sentencing in this case, the trial court first entertained objections to the proposed guidelines sentencing range of 144 months to 240 months. The court denied a defense request to change the scoring of Offense Variable (OV) 6 (offender's intent to kill) from 25 to zero points. The court denied a prosecution request to change the scoring of OV 10 (exploitation of vulnerable victim) from zero to five points.

Defense counsel then addressed the trial court as follows:

> . . . Your Honor, I -- I will be brief as you were the Judge that sat through the jury trial and heard the evidence. You've heard the prosecutor's theory of the case and you heard my client's theory of the case. Obviously, the jury believed that there was some culpability on my client and they came back with a verdict of second degree murder. But, when you look at the full facts of this case and the living arrangements and the way this couple had lived for the last ten years I think there's no doubt that this was a very hostile relationship, so to speak, at times. And I'd ask the court to be lenient on my client and ask for the lower part of the guidelines. The guidelines score her at 144 to 240, I believe, at -- on the minimum range and we'd ask that your Honor score -- sentence her to the lower end of that guideline.

Defendant presented a statement on her own behalf, the victim's sister presented a statement on behalf of the victim's family, and the court also heard from the victim's best friend. The prosecution then addressed the court, requesting that it "significantly exceed the sentencing guidelines" and sentence defendant "at a minimum, on the low end, to 30 years." The prosecution argued:

> . . . I'm asking the court to significantly exceed the -- the sentencing guidelines. I recognize that they're basically recommendations at this point. I'm asking that the court sentence Ms. Dixon-Bey at a minimum, on the low end, to 30 years. You know, we -- the legislature comes up with these numbers and I think generally they do a good job in terms of recommending sentences when it comes to something like this, a cold blooded murder. The -- the pain and the suffering that this family has to go through as a result of the defendant, the -- these numbers can't possibly capture any of that. There's just no possible way that it can.
>
> Ms. Dixon-Bey spent the entire trial painting a -- this picture of an abusive relationship about how Greg abused her. And I firmly believe that there was an abusive relationship, but she was the abuser. She was the one who had stabbed him multiple times in the past. Greg was the one who refused to cooperate with the police, who refused to cooperate with the prosecutor.
>
> You know, she also spent all this time talking about how he -- his drinking got worse and worse. Well, that's what happens when you're being abused. That's what happens in an abusive relationship. That's why his drinking got worse and worse, because of her. The -- I -- I can't possibly fathom what -- what the family's going through. The -- the -- the court heard the testimony. I'm not

going to resuscitate the testimony but, you know, this -- this was no accident. She stabbed him twice straight through the heart. She had done it in the past, she planned to do it, she told people she was gonna do it and did it on that day.

The -- the court has a profound opportunity to do great justice for the Stack family, for Greg and for the community, you know, that Greg was taken away from the family but he was also taken away from the community, and by all accounts he was a wonderful member of the community and I'm asking that the court sentence her to at least 30 years on the minimum end. That would put her in her 70s to make sure that the community is protected from her for as long as it possibly can be.

The trial court then articulated its sentence and the reasons therefore, as follows:

. . . All right, well the court sat through this trial, for several weeks I listened to a lot of testimony and I've learned that few people in this business are perfect. And Mr. Stack had a lot of really great qualities and he had one major fatal flaw, that's that he stayed in a relationship with you. And I -- I -- I don't buy your -- your theory that this was just some kind of domestic situation and you struck out at him in some type of vulnerability. In fact, I think some -- some -- some facts that were well established during the trial are significant and that's the -- first, is that you stabbed him not one but twice in the heart.

Mr. Carter,[sic] might've -- oh, you know, maybe Dr. Ortiz-Reyes, you know, cut that when he was doing the autopsy. That -- that wasn't-- there was a second stab wound and it was directly to the heart. One and one half years before this even occurred you slashed Mr. Stack, you know, such that he had to have reconstructive surgery on his hand. So, this wasn't the first time there was a domestic act of violence with you involving a knife with the victim. In fact, you told Mr. Gove that all I have to do is stick him in the chest and then claim self-defense. That was a statement that you made before the alleged time when he was -- Mr. Stack was stabbed twice in -- in the heart.

And then, on -- on -- on the night in question we know the murder weaponed [sic] vanished. It was never found, never able to be processed by the police.

So, you had the presence of mind to do that. You had the presence of mind to go ahead and try to minimize your role and then try to turn the focus, you know, back on Mr. Stack as being the cause. Well, today the focus is about you. An intent can be determined by what you did, what you said, both before, during and after the crime. And, frankly, you plunged that knife into Mr. Stack's heart twice and you brutally murdered him in cold blood. And for that by the power vested in me in the State -- by the State of Michigan you're to serve thirty-five (35) years to seventy (70) years in the Michigan Department of Corrections, five hundred dollars ($500.00) in court costs, three hundred and seventy-five dollars ($375.00) in fines, a hundred and thirty dollars ($130.00) to the Crime Victims

-4-

Rights Fund, sixty-eight dollars ($68.00) in State court costs, three hundred and fifty dollars ($350.00) in attorney's fees, sixty dollars ($60.00) in the DNA fee.

You know, with you married to another man in prison I'm just amazed he ever even stayed with you in the -- in a relationship. And -- and by the way, I did consider the sentencing guidelines which were 12 years to 20 years but I considered that the additional level of depraved heart and murder and the cold calculated nature of you brutally stabbing him twice in the heart and letting him bleed to death and die in this matter. So, the court believes my sentence is within the range. The guidelines are only advisory so you will serve that time. You'll be an old woman before you get out of prison.

Based on the record, I conclude that the trial court's sentencing decision reflects a "reasoned" process and a "reasoned" decision. The record makes clear that the court listened to the arguments of defense counsel and the prosecution. It listened to defendant, as well as to a family member and a friend of the victim. It evaluated the evidence after having spent several weeks listening to the testimony. It specifically took into account the now-advisory sentencing guidelines, and found that they did not adequately capture the circumstances before it. It noted what it saw as a heightened level of depravity underlying this particular murder, its "cold calculated nature," the fact that defendant stabbed the victim in the heart not once but twice, the fact that she had stabbed the victim in the past and that she had told a third party that she could stab the victim in the chest and then claim self-defense (precisely as she later did in this case), the fact that she disposed of the murder weapon after the killing, and that fact that her relatively young age necessitated a lengthy sentence to adequately secure the protection of the public.

In my judgment, the trial court's decision was a "reasoned" one that resulted from a "reasoned" sentencing process. Under the applicable abuse of discretion standard, given the level of deference that we afford to trial judges because of their greater familiarity with the facts and experience in sentencing, I cannot find on the record before us that the trial court's sentence was not a "principled" outcome.

Moreover, while the trial court "must … continue to consult the applicable guidelines range and take it into account when imposing a sentence," *Steanhouse,* __ Mich at __, slip op at 10, quoting *Lockridge*, 498 Mich at 392, the trial court expressly noted that it had done so here.[1] More significantly, proportionality in Michigan is not measured by the degree to which a departure sentence deviates from the guidelines, but rather by the seriousness of the offense. *Steanhouse,* __ Mich at __, slip op at 11, quoting *Milbourn*, 435 Mich at 636 ("Rather than impermissibly measuring proportionality by reference to deviations from the guidelines, our principle of proportionality requires 'sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' "). I find no abuse of discretion in the trial court's assessment of the circumstances of this offense and this offender as sufficiently serious to warrant the sentence imposed.

---

[1] I am puzzled by the majority's suggestion that I read *Steanhouse* as "encourag[ing] appellate courts to determine proportionality in a void without consideration of the sentencing guidelines."

To the extent, however, that we are to review the trial court's consideration of the guidelines, I also find no error. The majority suggests that the factors cited by the trial court were already taken into account by the guidelines. To that I must hearken back to the Supreme Court's disavowal in *Steanhouse* of earlier dicta suggesting that the "guidelines should nearly always control," and the above-noted admonition that proportionality is not measured in relation to the guidelines. *Steanhouse,* __ Mich at __, slip op at 11 (quotation marks and citations omitted). Moreover, I would not characterize the trial court's discussion of the two stab wounds merely as references to the use of a knife as reflected in OV 1 and OV 2; rather, it is clear that the trial court was referencing the two stab wounds to the heart of the victim in the context of other past and threatened stabbings and as supporting its conclusion that defendant had with a depraved heart planned and cold-bloodedly carried out the murder. The majority finds it significant that the trial court referenced the "cold-blooded" nature of defendant's crime without insisting that OV 7 (aggravated physical abuse) be scored at 50 points. I do not find this particularly significant, however, as cold-bloodedness is not necessarily merely a synonym for brutality under OV 7.

Moreover, while the trial court was constrained by the language of MCL 777.36(2)(a)[2] from scoring OV 6 (offender's intent to kill) at 50 points rather than 25 points, it was not constrained from finding that the guidelines range did not take into account defendant's premeditated intent to kill. The trial court made reference to the fact that defendant had talked about stabbing the victim and claiming self-defense, that she had stabbed the victim in the past, and that she disposed of the murder weapon after committing the offense. These facts support the inference that OV 6 was given inadequate weight. And although OV 19 (interference with the administration of justice) was not scored, defendant's conduct in both initially lying to the police and in disposing of the murder weapon could not adequately have been captured by the scoring of this variable, because only one score of 10 points would have been permitted despite defendant's multiple acts of interference with the administration of justice. See MCL 777.49.

I also note that if 30 or more additional OV points had been scored, such as by scoring OV 6 at 50 points rather than 25 and scoring OV 19 at 10 points rather than zero, defendant would have been subject to the highest OV level under the guidelines. See MCL 777.61. An offender scored at the highest OV level for second-degree murder may be given, under the recommended guidelines, a minimum sentence of 162 to 270 months or life. *Id.* Consequently, had a different scoring of certain OVs been made, as I believe the record would have justified in this case, the trial court could have sentenced defendant to a minimum term of life in prison without even departing from the guidelines. See *People v Johnson*, 202 Mich App 281, 291; 508 NW2d 509 (1993) (holding that sentencing a defendant to a term of years that exceeds the recommended term of years in the guidelines is a departure even when a sentence of life would not be a departure).

---

[2] "The sentencing judge shall score this variable consistent with a jury verdict unless the judge has information that was not presented to the jury."

Finally, it is clear that the trial court considered the extent of its departure and was aware that defendant, in the trial court's words, would be "an old woman before you get out of prison." The trial court considered defendant's previous acts of domestic violence upon the victim (including slashing him with a knife to the point where he needed reconstructive surgery), her premeditated intent (as evidenced by her suggestion that she could stab the victim in the chest and claim self-defense), as well as her post-offense conduct and lack of remorse, in making this decision. I would hold that the trial court's sentence was not outside the range of principled outcomes, notwithstanding whether a different trial court (or this Court) may have reached a different outcome. *Steanhouse*, ___ Mich at ___, slip op at 10; *Babcock*, 469 Mich at 268.

I would affirm the trial court in all respects.

/s/ Mark T. Boonstra